I understand that I can reserve five minutes for rebuttal. Yes. Keep your voice up. As the Court knows, may it please the Court and Counsel, this case is about an unreasonable search and seizure under the Fourth Amendment. The primary reason we are here today is that the magistrate who made the recommendation and then the district court who largely adopted that recommendation violated Rule 56. They simply did not interpret the facts in favor of the plaintiffs. We've given you the whole timeline in the record of the facts, you know, with citations to each statement. And under that story, under that version, what clearly happened was the officers first knew that Tim Williams, the deceased, was in his home and was allowing Mary Ann Taylor to stay as a guest because she had been beat up by her partner. She had a domestic violence protection order. They had both been contacting the sheriff and the undersheriff, Roberts and Weaver, about this for about three weeks. What is important to note here, too, is the context. We're talking about Eden, Idaho, a town of a couple hundred people. What was the constitutional violation? The constitutional violation was an unreasonable search and seizure by going into a home, invoking what is likely an armed confrontation because they knew Mr. Williams was in the home with a gun because he had been beaten and because he was being stalked. Mary Ann Taylor told them that. Well, they had a warrant, did they not? They had the warrant. The warrant gives them authority to do a search. It does not allow them to conduct a search in an unreasonable manner. What they did was chose to go into this man's home knowing he would come to the door with a gun. How did they know that? How did they know that he may come in? How did they know that when they entered the door, how did they know that if they entered, they were going to face Mr. Williams with a gun in his hand? Well, they knew the likelihood for Mary Ann Taylor telling them that's what would happen. They knew that he was, in fact. Did she tell them that he had a gun? A gun in his waistband and was likely to come to the door with a gun because he was afraid of this Norgard fellow. That's specifically cited in the record. Because he was afraid of what? Her partner was this drug addict named Norgard. He's the guy who had beaten him the week before. Well, let me ask you this. In a lot of search warrants, you know, obviously either it's not at all uncommon that in search warrant affidavits there's indications that the person in the residence has been seen armed or they may even be going searching for guns as far as that goes. So that factor, you know, the fact that someone could be armed or that there could be weapons in the residence is not really an unusual circumstance for serving a search warrant. So, you know, short of not going there, what could the officers have done? I mean, they did have a search warrant. What alternatives did they have? First of all, let me agree with you. Especially in rural Idaho, everyone has a gun in their house. That's not a surprise. What's different here is you knew the guy was afraid and was being stalked. And you had court orders trying to keep the guy there. You had Mary Ann Taylor going into the county courthouse that day and asking Roberts to identify her. But I guess anyone, though, obviously being startled in your home, you know, I mean, obviously the whole purpose of a search warrant is they don't usually call ahead and say that they're coming. And so there is sort of the element of surprise. And probably part of the element of surprise is an officer safety issue in terms of get there, you know, don't call someone and let them be ready at the door with you. So I guess is, you know, obviously he had had this confrontation with this NORGARD, and NORGARD had threatened to kill him. And I think you also alleged that he had a hearing issue. He apparently did have a hearing problem. Something, you know, that there was some indication that he might not hear well. Ms. Taylor indicates that she told the officers that, yes. But to get back to your point, this isn't simply a case where somebody said, we've got a search warrant, and then every time we have a search warrant, we obviously want to surprise them. We want to get what we want. They didn't just surprise this man. They went inside his garage. They came through unannounced. Did they knock on the door? They did not knock on the door. So they didn't knock and announce their presence? No. If you look at the layout of the house, it's the bottom floor is the garage in front with the home, you know, on the backside of the garage, 20 feet across the garage. They came through that door between the two garage overhead doors unannounced. To get into the house, was there a door? Well, there's a door between the garage and the hallway at the back of the garage. Did they knock on that door? They contend they knocked, shouted, waited. This whole scenario where they contend they waited 10 seconds. Knocked three times, waited, announced. That's in dispute. Mary Ann Taylor says she heard a whispered, muffled noise out there. Well, you know, there's not a reasonable time for them to open the door. Well, all right. Let's assume that they, I mean, it's not disputed that they had a warrant, all right? But let's assume all inferences in favor of the plaintiff in terms of the entry and the arguments that you're making. And let's assume a constitutional violation for this moment. Obviously, after they were in the house, it's total chaos. I mean, it's just a total shootout. When you get to the second prong of saucier, how do you overcome that in terms of what a reasonable, you know, Well, what's undisputed and what happened was as they kicked down that door between the garage and the hallway, he's there with a gun. That's not a surprise. The search was not planned as any dynamic search would be planned where you have some distraction so that when you break through somebody's door, they're not right there. They didn't give him time to come up. What would you expect him to be doing if he was compliant? You would expect him to be coming to the door with a gun. He's in front of the door. If we get you over the first prong, tell me how to get over the second prong. About whether they had notice of what was reasonable. No, what a reasonable officer. Well, look at some of the cases I've looked up since I've gotten the name of the panel are United States v. Mendoza, 989F 2nd 366, where Justice Huck, under the federal knock and announce statute, said that three to five seconds isn't a reasonable time to wait when you don't have any exigency. We have no exigency in this case. They couldn't have waited even three to five seconds. They got to that. First of all, they went in the residence, the garage unannounced. Now, second, when you get inside that garage unannounced. Did that have anything to do with Taylor telling them they could go in that way? She didn't tell them. I mean, could a reasonable officer have thought that they had consent to go in that way? No, a reasonable officer could not, if you read the facts in our favor, because the reasonable officers knew that she was only a guest in his home while those same officers and Mr. Williams were trying to get her into a shelter away from Norgard for those two weeks. But they knew she was at least living there for the time being. She was a guest in the home. She was living there, wasn't she? She was a guest in the home for the two weeks after December 17th. She didn't have authority to enter. So she wasn't free to go in that place and leave at her pleasure? No. So when she was in there, she was locked up, and when she was out, she couldn't get back in unless she was there? She could go out. She couldn't get in. She couldn't get back in unless Mr. Williams was there? Yes. And that was their entire plan. The officers knew that. They used her to knock on the door because they knew she would unlock the door and let her in. She didn't have the – they couldn't reasonably think they had consent to enter when they needed her to knock on the door to be let in. She didn't have the ability to get in. If you want to save some time for rebuttal. I would. Okay. Thank you. Thank you. Thank you. May it please the Court. Counsel. Counsel, Madam Clerk. Privileged to be here today to speak to the panel on behalf of Sheriff James Weaver and Jerome County. My co-counsel is here to address the Court on behalf of Under Sheriff Jocelyn Roberts and will be splitting the time between us. Your Honor. What's your name? Martin Hendrickson, Your Honor. Your Honor, in fact, the district court examined the record very carefully in this case. Both the magistrate judge and the district judge. And they both applied Rule 56 in a proper manner and took the facts in favor of the plaintiffs and found that there were no material disputes that would prevent summary judgment under the Fourth Amendment standards that have been set forth by this Court in Alexander and subsequently in Billington. That there was no constitutional violation that preceded the use of deadly force that occurred when the officers entered the home. Let me ask you a question. Certainly. You cited, I believe, Billington v. Smith as the standard at the time of the incident? But I think it was decided after that. Yes, absolutely. So I'm curious what was the standard at the time of the incident or what authority can you cite for the proposition that that was the standard? Sure. Your Honor, if you read Billington, in analyzing Billington, what the court did in Billington was to say that it was a very similar case in terms of the claims that were being made by the plaintiffs. We had claims in Billington that poor tactics, bad decisions on behalf of an officer led to an otherwise defensive constitutional use of deadly force and that because of the poor decisions, bad tactics on behalf of the officer that were alleged to have taken place, that made the use of deadly force unconstitutional. Now, what the court in Billington looked at was a couple of different approaches that were suggested by the parties in that case. The plaintiffs in that case wanted the court to adopt an approach such as the Tenth Circuit has in Allen where you just look at the reasonableness of the tactics and you can establish a constitutional violation theoretically based upon poor tactics. And the Ninth Circuit said, no, we're not going to do that. They also said that we're not going to cut off the inquiry, though, at the moment of the shooting and we are going to allow some consideration of previous events consistent with Alexander. So really in Billington, we don't view Billington as doing anything new. What we view Billington as doing is explaining what the standard was and the standard that existed at the time as set forth by Alexander, Reynolds, Scott, Duran. And that standard is that when you have an otherwise constitutional use of deadly force, a defensive use of deadly force, which we clearly had here, that the only way that you can show a constitutional violation or that you can turn that into a constitutional violation is by proving that there was an independent constitutional violation that then provoked the violent response. Well, what about appellant's arguments, obviously, from the standpoint I mean, this clearly went terribly wrong. I mean, it's a terribly tragic situation. Absolutely. But on, you know, I mean, two officers are killed, the defendant's killed. I mean, it's a terribly tragic situation. And, you know, clearly, I mean, it wouldn't be advisable to repeat the same entry. Now, they did have a search warrant, but, you know, obviously appellant's saying they had information, you know, giving all inferences in favor of the plaintiff or the appellant in this matter that, you know, that he was, you know, he had had a recent threat in his life. He was very frightened and was prepared to defend his life. And that is, you know, arguably different than, say, just knowing people have guns or knowing that they're armed. And, you know, I don't know if we can take judicial notice, but according to appellant, everyone here has guns in their home. I don't know if that's true or not. I come from California. But the, you know, is, you know, I mean, there was, he had had a recent incident, and they knew about a recent incident where his life had been threatened and he was answering the door with a gun. He's obviously saying, you know, just because they had a search warrant, they needed to do a different type of entry in order not to, you know, raise the level of danger here. Well, first of all, Your Honor, what Scott and Reynolds and Billington tell us is that we're not allowed in looking at a use of deadly force to go back and criticize the tactics that were used by the officers. And if there were less intrusive means that were available under Scott and Reynolds, you know, that's not an appropriate inquiry. But, Your Honor, I think that even if you do look at those alleged disputed facts that are in the record, the officers here, the approach, was still within that realm of reasonableness. The officers, it's clear that what the plan was was to go in and that they did in fact knock and announce. And the record is clear in this matter.  They knocked on the door. They pounded on the door. Deputy Jim Molson pounded on the door with his fist, yelled, Sheriff's Department search warrant, yelled and pounded loud enough that he was heard by an officer who was behind the house. And he pounded, announced, waited. There was no response. Pounded, announced again, waited, and then kicked open the door. Well, what did Taylor say about that? Taylor does not contradict that, Your Honor. What Taylor says, if you look at her statement that she gave to the ISP immediately following the incident, she says that they knocked and announced, that they did it loudly, that it was obvious by the way they knocked and announced that it was law enforcement. And that goes back to your original question, Your Honor, of how should they have made the entry. That's exactly how they did it was so that they would, so that Mr. Williams would know it was law enforcement, that they would then confront him with overwhelming force. I think that's a pretty well-known tactic in these types of situations that you go in. Even if you have somebody who may have a weapon or access to a weapon, you confront them with overwhelming force and expect them to comply with the officer's directions. And that is not what happened. And that's what precipitated the shooting was that despite the announcement, despite the fact that they came in and confronted him, and even once the door was down, said, you know, drop your weapon, drop your weapon, that he did not comply with their instructions. And that's what happened. That's when the shooting happened. Can I adjourn now? Yes. For those reasons, Your Honor, we respectfully submit that the district court should be affirmed. Thank you. May it please the Court and Counsel, my name is Curt Naylor. I represent Jocelyn Roberts, the undersheriff in this case. Just to follow up on a couple of points as far as the preplanning and the events that led up to this tragedy, I think as Judge Callahan has pointed out that the second prong of Billington and Saussure is critical here because there's nothing in the record to support the defendant's, the plaintiff's, argument that there was an intentional and reckless provocation of an independent, unconstitutional nature that would lead, that resulted in this not being conduct that a reasonable officer would have taken under the circumstances. Yes, they knew of some concerns. They knew that Mr. Williams may have had a gun, but they took reasonable precautions with having the amount of force, the support, the officers in the perimeter. But we don't even have to go there, judges, because that is exactly what Billington rejected based upon the existing precedent in the Ninth Circuit, which would be the standard in January 2001, even though the Billington case came out shortly thereafter, that we don't follow the Allen argument, that we look at all of the acts leading up to and decide that if we would have done something different with 20-20 hindsight that the outcome would have been different. We have to establish that these police officers had an intent to provoke the response in a violent confrontation that was an unconstitutional act on its own, such as in the Alexander case, where their conduct was completely unreasonable, given the circumstances for a police officer. Let me ask you something directly about under Sheriff Roberts. There's the allegation that when she entered, that she entered and into the bedroom that she shot him when he was down, shot Mr. Williams when he was down. Is there anything in the record that would support that? No, there isn't, Judge Paz, because the only piece of information that the plaintiff is relying upon is a third hearsay, triple hearsay statement of Rose Vaughn, Officer Rose Vaughn, who testified that Officer Roberts had said after the incident that she had shot Williams two times. She, as you read the deposition testimony carefully, she inferred, or as she said, she understood that that must have been in the bedroom because that's where Williams ultimately ended up dying. But Roberts was never, there's nothing in the record that says Roberts said that she was in the bedroom. But even if you follow the plaintiff's argument, then you have the argument that he was, that she was standing over Williams, the testimony was or the statement or the inference was that he was reloading and about to shoot the confidential informant, Marian Taylor, who was hiding in the bedroom when Jocelyn shot. So even under those circumstances, her conduct would have been reasonable. Plus, there's nothing in the evidence that shows that Mr. Williams was incapacitated even at the time that Marian Taylor says she went to the second bedroom because she left, because he had pointed, looked at her in the closet and said, you bitch. And he seemed to be fumbling with his gun. So he still had control of the gun, which would also be a reasonable officer to believe that he'd already killed two officers, that her life was personally in danger, which is not the case in some of the other precedents. So even taking the plaintiff's facts as argued, and I'm not even agreeing that they're in the record, but even as they are argued, Officer Roberts was reasonable under the circumstances, but there is no evidence that she ever reentered. In fact, Marian Taylor said that she heard Jocelyn Roberts from outside calling to her to come out of the house, and that's when she left the house. I have two questions. Yes. One, just as a matter of curiosity, why would the police have entered through the garage? Because at that time under the construction of the house, there was no other entry. The other, this was a split-level house, and I'm trying to remember how, why there was, and because they were living in the bedroom, the kitchen was in the bedroom, so the way the house was under construction, the only access was through the garage into the interior garage door into the house. Okay. Second question, what is reflected in the record as to the time elapsed between the knock and the announce and kicking down the door? The only thing that is in the record is under her deposition testimony, Jocelyn Roberts was asked to guess approximately how long the time had elapsed, and there was a ten seconds. That's the ten-second timeline that the plaintiff is arguing. So, but there was still enough time, even by Marian Taylor's statement to the ISP shortly after, that there was a loud knock, they announced themselves, and Marian Taylor said at that time that Williams said, they're not going to take me alive, so he had some recognition of who there was. And I think, even under the recent U.S. Supreme Court case, that so long as there is a recognition of who is out there, the time is not so relevant to be able to say five seconds or ten seconds or 20 seconds, Judge. Anything further? Thank you. Thank you. First, with respect to your question about what's in the record about the time, I would refer you to what we provided to the district court. The timeline, I think, is especially useful at page 33 of the excerpt, which cites each event as it supposedly unfolded. At most, they could have waited if Jocelyn Roberts' best estimate of how long it took them to go through the garage, check the door between the garage and the house, then knock, then wait, and then kick the door at least three times before it comes open, and then immediately start shooting was ten seconds. They couldn't have waited from the time of knocking three seconds at the most. We've laid it out in the timeline. It simply couldn't have been a reasonable amount of time under Mendoza. I want to go back to a case, as I said before, when I understood who was going to hear this. Justice Paez recently authored a case, Hell's Canyon or Hell's Angel, sorry. Hell's Angel Moto Club. And in that case, what was interesting was the allegation was they had time to do these search warrants on various Hell's Club members' homes. They got a week to plan. They don't plan for the eventuality that they're going to create dogs. They're going to encounter dogs, except to shoot them. And your decision says they created this plan designed to bring the officers into proximity with the dogs without any means other than lethal means to control the dogs, and quite predictably, they get there. The dogs attempt to guard the house like dogs do, and they shoot them. I would submit Mr. Williams is entitled to the same consideration as the dogs. You don't sneak through the garage. You don't knock and immediately kick in a door, especially when you know the man on the other side's got a gun because he's afraid of somebody else. Remember, we did not sue the two officers who were deceased or their families who did the shooting. We think they shot, just like Mr. Williams shot, because they were put in that situation without time to think or respond. Okay. Given that. Your time's expired. I would thank you for the time. Thank you. The matter will be submitted. Thank you.
judges: Hug, Paez, Callahan